UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X

                                     :

ROBERTO CARLOS DE JESUS,         :

                                     :

                       Movant,    :

                                     :

               v.                :

                                     :

UNITED STATES OF AMERICA,      :

                                     :

                Respondent. :

                                     :

------------------------------------------------- X

|  |  |
|---|---|
| USDC SDNY | |
| DOCUMENT | |
| ELECTRONICALLY FILED | |
| DOC #: _____ | |
| DATE FILED: May 10, 2016 | |

15 Civ. 5741 (KPF)
13 Cr. 438-01 (KPF)

OPINION AND ORDER

KATHERINE POLK FAILLA, District Judge:

      Roberto Carlos De Jesus[1] was arrested in May 2013, and indicted the following month on a narcotics conspiracy charge that carried a ten-year mandatory minimum term of imprisonment.   In January 2014, De Jesus pleaded guilty pursuant to a plea agreement with the Government to a lesser included offense, one that carried a five-year mandatory minimum.   In May 2014, De Jesus was sentenced principally to a term of 87 months' imprisonment.   In June 2015, De Jesus filed a motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255, claiming ineffective assistance of counsel at both his plea and sentencing.   For the reasons set forth in the remainder of this Opinion, the motion is denied.

---

[1]      De Jesus has previously indicated that his true name is Ignacio Roberto De Jesus Cruz. However, because his submissions in connection with the instant motion use the name under which he was indicted, "Roberto Carlos De Jesus," the Court will use that name as well.

# BACKGROUND

## A.      Factual Background[2]

In January 2013, the Drug Enforcement Administration (the "DEA")

began investigating a drug-trafficking organization that distributed heroin in

New York and Massachusetts.   During the course of the investigation, agents

obtained information from one or more confidential sources, GPS tracking data,

physical surveillance, and intercepted telephone conversations occurring over a

cell phone used by De Jesus.   The following individuals were identified as

participants in the organization:

- **Roberto Carlos De Jesus** was identified early on as the leader of the organization, whose responsibilities included obtaining heroin from various sources of supply; finding customers for the heroin once it had been broken up and repackaged; recruiting participants in the organization; and arranging for the collection of money from customers.

- **Juan Rafael Gonzalez** and **Manuel Gonzalez** were brothers who investigated and arranged for sources of supply of heroin to De Jesus.

- **Benjamin Munoz**, who was referred to in charging instruments as **Wilfredo Rivera-Acosta**, engaged in heroin transactions with De Jesus, as evidenced by recorded conversations in which the two discussed an ultimately abortive transaction involving a half-kilogram of heroin.   Munoz had previously been deported from the United States in 2011 after serving time for a different heroin conspiracy, but had illegally

---

[2]     The facts set forth in this section are derived from the Offense Conduct section of the Presentence Investigation Report ("PSR") prepared in connection with De Jesus's sentencing (*see* PSR ¶¶ 10-25); and from information obtained by the Court in presiding over this matter for nearly three years, including information obtained in the course of sentencing De Jesus and his 15 co-defendants.

reentered the country in 2013 to resume trafficking in narcotics. In May 2013, Munoz was stopped by law enforcement with De Jesus in Reading, Pennsylvania, while en route to obtain fraudulent identification documents.

- **Xiomar Mantilla** was De Jesus's primary wholesale heroin customer during the period of the investigation. Mantilla lived in Holyoke, Massachusetts, and was connected to De Jesus through Mantilla's girlfriend, whose mother had a close personal relationship with De Jesus. On multiple occasions during the spring of 2013 — as evidenced by numerous intercepted telephone calls between the two — Mantilla purchased heroin (in quantities of approximately 100-150 grams each time) from De Jesus in the Bronx, which heroin he then resold to street-level customers in Holyoke.

- **Jose Taveras-Rosario** managed the De Jesus organization's heroin mill; among other things, Taveras-Rosario recruited workers and ensured that the heroin was processed and bagged. The DEA investigation revealed that workers at the mill obtained, processed, and re-distributed heroin on approximately 10 occasions between January 2013 and May 2013, in amounts ranging from 80 to 250 grams per occasion.

- **Jose Cruz** repackaged the heroin for distribution at the heroin mill, and was involved (albeit seemingly at a lower level) in selling heroin for De Jesus.

- **Jose Holguin**, **Lorenzo Rivera**, **Juan Manuel Antonio**, **Dionisio Vasquez-Hernandez**, and **Juan Suriel** were also "mill workers," though the number of times that each man repackaged heroin varied.

- **Yisel Heredia** became involved in the organization in 2013 because of her personal relationship with De Jesus, the father of one of her children. In April 2013, Heredia delivered heroin on De Jesus's behalf to an individual affiliated with Xiomar Mantilla. In addition, Heredia allowed De Jesus to use her bank account to receive and launder narcotics proceeds from Mantilla.

3

- **Becky Reyes**, like Yisel Heredia, was also induced to participate in the conspiracy because of prior romantic ties to De Jesus.  On at least one occasion in May 2013, Reyes transported drug proceeds to De Jesus. In addition, upon learning from De Jesus of his concerns about law enforcement surveillance, Reyes offered to collect outstanding narcotics debts on De Jesus's behalf if he were to be arrested.

- **Estefania Torres** was the daughter of Becky Reyes and the girlfriend of Xiomar Mantilla.   Torres had introduced Mantilla to De Jesus for the express purpose of facilitating their narcotics business, and received (or sought to receive) a commission from the transactions between Mantilla and De Jesus.

- **Yolanda Lopez** was the mother of Becky Reyes and the grandmother of Estefania Torres.    On several occasions in 2013, Lopez transported narcotics proceeds from Massachusetts to De Jesus in New York, either by bringing it to him directly, transferring it to another individual who then brought it to De Jesus, or wiring the money to bank accounts in New York as designated by De Jesus. To this end, Lopez participated in several communications with De Jesus that were intercepted as part of the Government's investigation. Lopez was also responsible for persuading her daughter, Becky Reyes, to transport drug proceeds to De Jesus in May 2013.

As a result of calls intercepted over the wire on May 12, 2013, and related surveillance, law enforcement determined that De Jesus and his associates would be preparing packages of heroin for redistribution at an apartment in the Bronx that day.   (PSR ¶¶ 17-18).   In consequence, agents located and entered the apartment — which was in fact the organization's mill — that afternoon and secured it as a search warrant was obtained.   As agents entered the apartment, they observed Cruz, Holguin, Rivera, Heredia,

Taveras-Rosario, Antonio, Vasquez-Hernandez, and Suriel run to a bedroom in an effort to climb out a window onto the building's fire escape.   These individuals were arrested that day, as were De Jesus, Juan Rafael Gonzalez, and Manuel Gonzalez, who were observed by law enforcement exiting the apartment building shortly before the raid.   (*Id.* at ¶¶ 18-19).

Inside the apartment, law enforcement recovered multiple packages of heroin, packaging materials, coffee grinders used to grind the heroin, loose heroin that had not yet been packaged, and glassine envelopes. Approximately one-half of a kilogram of heroin was seized from the mill that day.   (PSR ¶ 19).

**B.    Procedural Background**

**1.    The Relevant Charging Instruments**

De Jesus and 11 of his co-defendants were arrested in the course of the DEA's raid on May 12, 2013, and were charged in a criminal complaint the next day.   (Dkt. #1).   Indictment 13 Cr. 438 (KPF) was filed on June 10, 2013, charging De Jesus and others with conspiring to distribute and to possess with the intent to distribute one kilogram and more of heroin, from at least in or about April 2013 up to and including May 13, 2013, in violation of Title 21, United States Code, Sections 846 and 841(b)(1)(A).   (Dkt. #35).   The charge carried a mandatory minimum term of 10 years' imprisonment, and a statutory maximum term of life imprisonment.

After indictment, the case was assigned to this Court, and De Jesus and his co-defendants were arraigned at a conference held on June 14, 2013. (Dkt. #37).   A superseding indictment, S4 13 Cr. 438 (KPF) (the "Indictment"), was filed on October 7, 2013, adding defendants but not otherwise altering the charge against De Jesus.   The defendants in the Indictment, including De Jesus, were arraigned at a conference held on October 31, 2013.   (Dkt. #104).

### 2.    De Jesus's Guilty Plea

#### a.    The Plea Agreement

By Order dated November 20, 2013, the Court scheduled trial in this case to begin on February 18, 2014.   (Dkt. #86).   Thereafter, the Government provided De Jesus with a plea agreement dated December 26, 2013 (the "Plea Agreement").   The Plea Agreement contemplated a guilty plea by De Jesus to a lesser-included offense of Count One of the Indictment, specifically, the offense of conspiring to distribute and to possess with the intent to distribute 100 grams and more of heroin, in violation of Title 21, United States Code, Sections 846 and 841(b)(1)(B).   (PSR ¶ 6).

In the Plea Agreement, the parties stipulated to a range under the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") of 108 to 135 months' imprisonment, with a mandatory minimum term of 60 months' imprisonment.   (PSR ¶ 6).   This Guidelines range was based on an offense level of 31 and a Criminal History Category of I.   The offense level, in turn, was calculated based on the parties' stipulated base offense level of 32, because the

offense involved at least one kilogram but fewer than three kilograms of heroin. (PSR ¶ 6; *see* U.S.S.G. § 2D1.1(c)(4)).   The offense level was then increased by two levels because the parties agreed that De Jesus was an organizer, leader, manager or supervisor of criminal activity.   (PSR ¶ 6; *see* U.S.S.G. § 3B1.1(c)). After crediting De Jesus with a three-level reduction for his contemplated acceptance of responsibility, the parties stipulated to an overall offense level of 31.   (PSR ¶ 6).

### b.    The Appointment of a Second CJA Attorney

On January 14, 2014, the Government, De Jesus, and David Touger (the latter of whom had been appointed to represent De Jesus pursuant to the Criminal Justice Act, 18 U.S.C. § 3006A) appeared before the Court to discuss the status of the case.   (*See* Transcript of Proceedings dated January 14, 2014 ("Jan. 14 Tr.")).   At the conference, Touger explained that De Jesus did not want to take a guilty plea to the lesser-included offense in Count One of the Indictment as set forth in the Plea Agreement; Touger believed this decision to be "a major tactical error" on his client's part, and he therefore requested that the Court appoint a standby lawyer to review the case with De Jesus for a "second opinion."   (Jan. 14 Tr. 3).[3]

In the course of the Court's inquiry into whether there was a "breakdown in the [attorney-client] relationship," De Jesus indicated that Touger had been

---

[3]     At the conference, the Government indicated that the above-described plea offer had expired, but that the matter could likely be "resolve[d] ... on the same terms" if De Jesus were to plead guilty in the near term.   (Jan. 14 Tr. 4).

"a good attorney." (Jan. 14 Tr. 5-6). The Court further clarified that Touger did not wish to be relieved from representing De Jesus, but rather wanted De Jesus to have a second opinion about whether to plead guilty or go to trial, and De Jesus agreed. (*Id.* at 6-7). Accordingly, the Court appointed the duty CJA attorney, Donald DuBoulay, to provide a second opinion to De Jesus concerning his case. (*Id.* at 7-8).

### c. The Plea Proceeding

The Government, De Jesus, and Touger reconvened before the Court on January 30, 2014, at which time De Jesus entered a guilty plea to the lesser included offense of Count One. At the outset, Touger thanked the Court and the Government "for allowing Mr. De Jesus the time to rethink his opinions of the plea agreement from last week, and I think we've reached a good conclusion." (Transcript of the Proceedings of January 30, 2014 ("Plea Tr.") 2). The Court then confirmed with De Jesus, who was receiving assistance from a Spanish-language interpreter, that he "wish[ed] to plead guilty to a lesser-included offense [of] the charge that is contained in Count One of this indictment." (Plea Tr. 3). Upon receiving an affirmative response, the Court (i) admonished De Jesus to advise the Court if he did not hear or understand any part of the plea proceeding; (ii) had De Jesus placed under oath; and (iii) advised De Jesus that as a consequence of being placed under oath, any false answers he provided could subject him to a separate prosecution for perjury. (*Id.* at 4-5). De Jesus indicated that he understood. (*Id.*).

8

The remainder of the plea allocution comported fully with the requirements of Rule 11 of the Federal Rules of Criminal Procedure.   Rather than recapitulate it fully, the Court will instead focus on those aspects that are particularly significant to the instant motion.   First, De Jesus averred that he had had "a sufficient opportunity to discuss with [his] attorney the charge to which [he intended] to plead guilty and any possible defenses that [he] might have to that charge."   (Plea Tr. 7).   He further confirmed that he was satisfied with attorney Touger's representation of him in the matter.   (*Id*.).   Later in the plea proceeding, the Court outlined the elements of the offense to which De Jesus intended to plead guilty and the penalties associated with that offense, including the five-year mandatory minimum term of imprisonment, and De Jesus affirmed that he understood.   (*Id*. at 12-16).[4]

The Court confirmed that De Jesus understood what the Guidelines were; that they were advisory; and that they would be one of several factors considered by the Court at sentencing.   (Plea Tr. 18-19).   It then obtained acknowledgement from De Jesus that "[e]ven if your sentence is different ... than what you might have expected or hoped for ... you will still be bound by your guilty plea.   You will not be allowed to withdraw your plea of guilty."   (*Id*. at 19-20).

---

[4]     The Court specifically inquired of the Government whether De Jesus would be eligible for relief from the statutory mandatory minimum pursuant to the so-called "safety-valve," *see* 18 U.S.C. § 3553(f).   (Plea Tr. 16).   The Government advised the Court, without objection from the defense, that "[a]s part of the plea agreement, the defendant has agreed to leadership points, which I think takes the safety valve out of play."   (*Id*.).

The Court then proceeded to review the Plea Agreement with De Jesus. De Jesus testified that the Plea Agreement had been translated into Spanish before he signed it, and that he "fully underst[oo]d" the Plea Agreement before he signed it. (Plea Tr. 20-21). The Court reviewed with De Jesus certain provisions of the Plea Agreement, including the Guidelines stipulations between the parties, to which the Court indicated that the parties were "bound." (*Id.* at 21). It then reviewed with De Jesus the waiver provisions of the Agreement, including the provision in which De Jesus waived his right to challenge any sentence of imprisonment within the stipulated Guidelines range of 108 to 135 months. (*Id.* at 22). The Court asked De Jesus, "if I sentence you to 135 months or anything less than 135 months, but more than 60 months, you are not going to appeal or otherwise challenge that component of your sentence," and De Jesus agreed. (*Id.*).

De Jesus acknowledged that the Plea Agreement "constitute[d his] complete and total understanding of the entire agreement between [De Jesus] and the Government," and, further, that he had not been "promise[d]" anything, "offered any inducement," "threatened," or "forced" to enter into the Plea Agreement or to plead guilty. (Plea Tr. 23-24). He further stated that no one "made any promise to [him] concerning [his] sentence." (*Id.* at 24).

The Court then asked De Jesus to state what he did that made him guilty of the lesser included offense charged in Count One of the Indictment. (Plea Tr. 24). De Jesus stated, "I agreed with one or more other persons to

distribute over 100 grams of heroin in Bronx County." (*Id.*).   De Jesus further
stated that when he entered into the agreement, he knew that it was "illegal."
(*Id.* at 24-25).   The Government then summarized the evidence it would
introduce at trial, and explained that the "evidence would establish that the
defendant was the leader of a drug organization in the Bronx that obtained
large quantities of heroin, broke it down into smaller quantities that it then
sold to individuals who were redistributing it on the street." (*Id.* at 25).   The
Court asked De Jesus whether he had heard the prosecutor and understood
the evidence that would be presented at trial, and De Jesus indicated that he
understood.   (*Id.* at 26).

At the conclusion of the proceeding, the Court accepted De Jesus's plea
of guilty and set the matter down for sentencing.   (Plea Tr. 26-27).

### 3.   De Jesus's Sentencing

#### a.   The Presentence Investigation Report[5]

In its Presentence Investigation Report, the Probation Office differed from
the parties in its assessment of the Guidelines.   It specified a base offense level
of 32, because "the defendant's criminal activity involved a conspiracy to
possess and distribute between 1 kilogram and 3 kilograms of heroin" (PSR
¶ 30); but then sought a four-level enhancement based on De Jesus's role as a
"leader/organizer of this distribution operation that involved more than five

---

[5]    After De Jesus's sentencing, the Court ordered certain modifications to his Presentence
Investigation Report.   In this section only, references to the "PSR" are to the pre-
modification version, i.e., the version in effect at the time of the sentencing.

11

participants" (*id.* at ¶ 33); and a three-level reduction for acceptance of responsibility (*id.* at ¶ 36).   Given a Criminal History Category of I, the Probation Office determined that De Jesus's Guidelines range was 135 to 168 months, and recommended a sentence of 135 months' imprisonment.   (*Id.* at 19, Sentencing Recommendation).

### b.      The Defense Sentencing Submission

In connection with sentencing, De Jesus and his counsel submitted a sentencing memorandum dated May 15, 2014 ("Def. Sent. Ltr.").   In it, the defense noted that "[w]hile the crime is clearly serious and Mr. Dejesus' role is as an organizer, the Court should not conceive of Mr. Dejesus as a major trafficker in narcotics who made a lot of money."   (Def. Sent. Ltr. 1).   In addition, De Jesus requested that the Court consider certain Guidelines amendments that were due to take effect approximately five months after the sentencing date, in November 2014, including an amendment that would reduce the base offense level for De Jesus's conduct by two levels and yield a Guidelines range of 87 to 108 months.   (*See id.*; *see also* U.S.S.G. Amend. 782 (modifying drug quantity tables in U.S.S.G. § 2D1.1)).   Ultimately, De Jesus requested a downward variance from the Guidelines to the mandatory minimum term of 60 months' imprisonment.   (Def. Sent. Ltr. 1-9).

### c.      The Sentencing Proceeding

Sentencing took place before the Court on May 29, 2014.   (*See* Transcript of Proceedings of May 29, 2014 ("Sent. Tr.")).   Early on in the

proceedings, the Court asked De Jesus directly if he had had a sufficient opportunity to review the Presentence Investigation Report, to which he responded in the affirmative; and if he had any objections to its contents (apart from the one raised in his sentencing submission concerning Amendment 782), to which he responded in the negative.   (Sent. Tr. 6).   The Court then discussed with the parties the reasons why each side had stipulated to a two-level, rather than a three- or four-level, enhancement for De Jesus's leadership role in the organization.   (*Id.* at 9-11; *compare* U.S.S.G. § 3B1.1(a) (four levels), *with* U.S.S.G. § 3B1.1(b) (three levels), *and* U.S.S.G. § 3B1.1(c) (two levels)).

Next, the Court probed certain of the parties' sentencing arguments. Counsel for De Jesus acknowledged — without objection from his client — that De Jesus was "the head of this ... drug conspiracy," but sought to contextualize the size and significance of the conspiracy.   (Sent. Tr. 14; *see also id.* at 17 ("I can't dispute that he asked other people to deal the drugs, stuff the bags and do that."); *cf. id.* at 18 (statement by Government that "Mr. de Jesus obviously did recruit a number of people, largely family members, to help him carry out the conspiracy.   It includes Becky Reyes, Yolanda Lopez, [Estefania] Torres, Jose Cruz and Yisel Heredia.")).[6]   And in distinguishing De Jesus's role in the

---

[6]      Counsel explained De Jesus's involvement as follows:

> [De Jesus] happened to know a person who had narcotics and was willing to sell him the narcotics. And he got a bunch of people who were really, as [the prosecutor] knows, some of them were his girlfriends, some of them were his family members and friends who — and some weren't, obviously, some were strangers, but who

13

conspiracy from those of certain co-defendants, the Government pointed out —

again without objection from the defense — that De Jesus had admitted

involvement with a greater quantity of heroin:

> I would note that Mr. de Jesus has pleaded guilty to a
> quantity that is four levels higher than Juan Gonzalez
> and Manuel Gonzalez.   They pleaded guilty to the
> heroin that was seized on May 13, 2013, which was
> between [400] and 700 grams.   Mr. de Jesus has
> pleaded guilty to the quantity involved in the larger
> conspiracy, which was between 1 and 3 kilograms.

(*Id.* at 21; *see id.* at 26-28 (Government noting differences between De Jesus

and the Gonzalez brothers to include: (i) "[De Jesus] has pleaded guilty to what

the government understands to be the quantity involved — the quantity that

the organization had distributed entirely, and that's between 1 and 3 kilograms

of heroin" and (ii) De Jesus had stipulated to a two-level enhancement for his

leadership role)).

The Court also discussed with the parties the proposed amendments to

the Guidelines, including Amendment 782.   Stated summarily, the

Government opposed prospective consideration of Amendment 782 in

calculating De Jesus's Guidelines range, while the defense sought

consideration of the amendment or adjournment of the sentence until after

---

> were willing to make them into the sellable form of the drug. And
> then he sold them to somebody who would distribute them.
>
> So, yes, he was the head of this, quote, drug conspiracy, but he's
> not Al Capone is what I'm trying to say.

(Sent. Tr. 13-14).

14

November 1, 2014.   (Sent. Tr. 22-25).   The Court determined to consider Amendment 782 in sentencing De Jesus, and made clear that "the sentence I impose today will be and would be the sentence I would impose irrespective of whether the amendments are enacted."   (*Id.* at 25).

The Court heard extensive argument from both sides concerning the appropriate sentence.   Of note here, defense counsel Touger made numerous arguments analogizing De Jesus's culpability to that of brothers Juan and Manuel Gonzalez, to the point of arguing that Juan Gonzalez was in fact De Jesus's "boss" in the conspiracy.   (Sent. Tr. 29-35).   Counsel did not dispute De Jesus's role enhancement, but instead acknowledged that a two-level — but not a four-level — enhancement was warranted because De Jesus had "family members and friends who were in the mill working" at his direction.   (*Id.* at 30).   Nor did counsel dispute De Jesus's involvement with one to three kilograms of heroin.   (*Cf. id.* at 34 ("This was a short conspiracy that did sell a lot of heroin, there is no doubt about that.")).

De Jesus was then given an opportunity to speak in connection with his sentencing.   (Sent. Tr. 36-38).   While expressing remorse for his actions and asking for leniency, De Jesus did not express surprise or disagreement as to the use of a one-to-three-kilogram quantity of heroin for base offense level purposes, or the imposition of a two-level enhancement for his role as a leader or manager within the conspiracy.   (*See id.*).

15

The Court then proceeded to sentence De Jesus.   (Sent. Tr. 38-46).
With particular respect to the appropriate role enhancement, the Court
concluded that, while it was skeptical of the parties' arguments for a two-level
enhancement and could identify arguments for a three-level enhancement, it
would impose a two-level enhancement.   (*Id.* at 39-41).   It further accounted
for the anticipated effect of Amendment 782 by imposing a sentence at the
bottom end of the range that would have applied had the amendment been
enacted, *viz.*, 87 to 108 months' imprisonment.   (*Id.* at 41).

In considering the arguments for leniency advanced by De Jesus and his
counsel, the Court observed:

> The fact remains that this conspiracy, while short[-]
> lived, was moving to my mind a significant quantity of
> heroin, and it was employing a number of people.   And
> so to the point that the Gonzalez defendants are more
> culpable or less culpable, I am going to put that to the
> side for a moment, because my decision to sentence Mr.
> de Jesus to 87 months is not a product of the Gonzalez
> members at all.   It really is the other family members
> and close friends that he had with him in this
> conspiracy.

> And I'm thinking in particular of three generations of
> women who[m] I have seen, Ms. Reyes, Ms. Lopez and
> Ms. Torres, and I will tell you, in case there is any doubt
> about this, their lives are ruined.   And the medical and
> psychological issues that they face and that their
> families face have been extraordinary.   [T]hat's not the
> only thing that I'm thinking of.   I'm thinking of the size
> of the conspiracy.   I'm thing of the guidelines to which
> the parties themselves have stipulated.   But I am
> thinking, as well, about the individuals whose lives were
> affected.

> And unlike many of my other cases where a person has
> really only hurt himself or herself and nobody else,

16

> there are a number of other individuals whose lives have
> been affected.   I am not suggesting a gun was held to
> their heads.   I appreciate that they made the decision
> to do this.   But having worked with Mr. de Jesus in this
> conspiracy, their lives are ruined, and I can't look past
> that.

(Sent. Tr. 42-43).

### 4.     De Jesus's Sentence Reduction Motions

In January and April of 2015, De Jesus filed separate motions for a sentence reduction pursuant to 18 U.S.C. § 3582(c)(2), each of which was predicated on the passage of Amendment 782.   (Dkt. #265, 278).   The Court denied each motion, noting, among other things, that "the Court already considered the reduced Guidelines range in sentencing Defendant; there is no basis for the Court to reduce the sentence further."   (*See* Dkt. #280, 289).

### 5.     The Section 2255 Motion

On July 14, 2015, De Jesus filed a motion to vacate, set aside, or correct his sentence.   (Dkt. #298).   On July 31, 2015, the Court ordered De Jesus to amend his motion, in order to (i) clarify his claims of ineffective assistance of counsel; (ii) address the waiver into which he had entered at the time of his guilty plea; and (iii) discuss the timeliness of his motion.   (Dkt. #302).   On or about September 24, 2015, De Jesus mailed an Amended Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody (the "Motion") to this Court.   The Court accepted the Motion, and ordered the Government to respond.   (Dkt. #316).   In December 2015, the

17

Court confirmed De Jesus's waiver of the attorney-client privilege, and ordered former defense counsel David Touger to file an affidavit.   (Dkt. #331, 333).

De Jesus's brief in support of the Motion ("Br.") is dated September 24, 2015; De Jesus has submitted several exhibits, including statements from several of his co-defendants.   The Government's opposition memorandum ("Opp.") is dated March 3, 2016; the memorandum was accompanied by several exhibits, including an affidavit from prior defense counsel.   Briefing on the motion concluded when De Jesus filed a reply memorandum (styled as a traverse to the Government's response) dated April 6, 2016 ("Reply").

In his submissions, De Jesus advances numerous claims that he received ineffective assistance of counsel at his plea and sentencing.   With respect to the plea, De Jesus contends that his former counsel (i) failed to negotiate a more favorable plea deal (specifically, one that replicated the drug quantity to which his co-defendants had admitted and did not contain a role enhancement); (ii) "used lies and deceit" to influence De Jesus to enter a guilty plea without reading the Plea Agreement; and (iii) failed to fulfill his promise that De Jesus would be deported within two years of the completion of his sentence.   (*See* Br. 7; Reply 4).   With respect to sentencing, De Jesus faults Touger for (i) agreeing to a drug quantity that was higher than that of De Jesus's co-defendants and to a two-level role enhancement; (ii) failing to request a downward departure based on the likelihood of De Jesus's

deportation; and (iii) failing to assist De Jesus at sentencing.   (*See* Br. 7, 9, 10).

## DISCUSSION

### A.  Applicable Law

#### 1.  Section 2255 Motions Generally

A prisoner in federal custody may seek to have his sentence vacated, set aside, or corrected on the grounds that it "was imposed in violation of the Constitution or laws of the United States, or that the [trial] court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack."   28 U.S.C. § 2255(a).   However, the grounds for such a collateral attack under Section 2255 are much more limited than those available on a direct appeal. *See United States* v. *Addonizio*, 442 U.S. 178, 185 (1979).   Relief may lie "only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes 'a fundamental defect which inherently results in a complete miscarriage of justice.'"   *United States* v. *Bokun*, 73 F.3d 8, 12 (2d Cir. 1995) (quoting *Hill* v. *United States*, 368 U.S. 424, 428 (1962)); *accord Cuoco* v. *United States*, 208 F.3d 27, 30 (2d Cir. 2000).

One potential basis for relief under Section 2255 occurs when a defendant has received the ineffective assistance of counsel.   A defendant in criminal proceedings has a right under the Sixth Amendment to effective assistance from his attorney at all critical stages in the proceedings; this

includes entry of a plea of guilty, *see, e.g.*, *Hill* v. *Lockhart*, 474 U.S. 52, 58 (1985); *Lafler* v. *Cooper*, — U.S. —, 132 S. Ct. 1376, 1387 (2012) ("Defendants have a Sixth Amendment right to counsel, a right that extends to the plea-bargaining process." (citations omitted)); and sentencing, *see, e.g.*, *Glover* v. *United States*, 531 U.S. 198, 202-04 (2001); *Mempa* v. *Rhay*, 389 U.S. 128, 134 (1967).

In order to succeed on a claim of ineffective assistance of counsel, a movant must meet the two-pronged test established by *Strickland* v. *Washington*, 466 U.S. 668 (1984): (i) he "must show that counsel's performance was deficient" to such a degree that, "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance," *id.* at 687, 690; and (ii) he must show "that the deficient performance prejudiced the defense," *id.* at 687, in the sense that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694.   *See generally Gonzalez* v. *United States*, 722 F.3d 118, 130-31 (2d Cir. 2013).

In evaluating the first prong, '[j]udicial scrutiny ... must be highly deferential,'" and the petitioner must "overcome the 'presumption that, under the circumstances, the challenged action might be considered sound trial strategy.'"   *Bell* v. *Cone*, 535 U.S. 685, 698 (2002) (quoting *Strickland*, 466 U.S. at 689) (alteration in original); *see Cullen* v. *Pinholster*, 563 U.S. 170, 196 (2011) (recognizing that counsel is accorded a "strong presumption of

20

competence").[7]   Putative errors on the part of counsel must be considered in the "aggregate" rather than in isolation, as the Supreme Court has directed courts "to look at the 'totality of the evidence before the judge or jury.'" *Lindstadt* v. *Keane*, 239 F.3d 191, 199 (2d Cir. 2001) (quoting *Strickland*, 466 U.S. at 695-96).

In order to satisfy the prejudice prong with respect to an ineffectiveness claim focusing on a plea of guilty, "the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial."   *Hill*, 474 U.S. at 59.   By contrast, satisfaction of the prejudice prong with respect to a claim of ineffectiveness at sentencing requires the defendant to show a reasonable probability that, but for counsel's substandard performance, he would have received a less severe sentence.   *See generally Glover*, 531 U.S. at 203 ("Authority does not suggest that a minimal amount of additional time in prison cannot constitute prejudice.   Quite to the contrary, our jurisprudence

---

[7]      *See also Strickland* v. *Washington*, 466 U.S. 668, 689 (1984) (citation omitted):

> Judicial scrutiny of counsel's performance must be highly deferential.   It is all too tempting for a defendant to second-guess counsel's assistance after conviction.... A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.... [A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

21

suggests that any amount of actual jail time has Sixth Amendment significance." (citations omitted)).

Because De Jesus is proceeding *pro se*, this Court has interpreted his submissions to "raise the strongest arguments that they suggest."   *McPherson* v. *Coombe*, 174 F.3d 276, 280 (2d Cir. 1999).   That said, De Jesus must satisfy both prongs of the *Strickland* test; that is because an ineffectiveness claim "must be rejected if the defendant fails to meet either the performance prong or the prejudice prong."   *Bennett* v. *United States*, 663 F.3d 71, 85 (2d Cir. 2011); *see also Strickland*, 466 U.S. at 697 ("there is no reason for a court deciding an ineffective assistance claim … to address both components of the inquiry if the defendant makes an insufficient showing on one").

### 2.     Developing the Record in Section 2255 Motions

In ruling on a motion under 28 U.S.C. § 2255, the district court is required to hold a hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief."   28 U.S.C. § 2255; *see also, e.g.*, *Pham* v. *United States*, 317 F.3d 178, 185 (2d Cir. 2003) (noting that 28 U.S.C. § 2255 does not permit summary dismissals of motions that present facially valid claims).   However, the filing of a Section 2255 motion does not automatically entitle the movant to a hearing, as, for example, in instances in which a movant's allegations are "vague, conclusory, or palpably incredible."   *Machibroda* v. *United States*, 368 U.S. 487, 495 (1962). Nor does the filing of a motion automatically entitle the movant to discovery.

*See* Rule 6(a), Rules Governing Section 2255 Proceedings (stating that a movant is entitled to undertake discovery only when "the judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise").

A district court may proceed using the "'middle road' of deciding disputed facts on the basis of written submissions." *Pham*, 317 F.3d at 184 (citations omitted); *see also Campusano* v. *United States*, 442 F.3d 770, 776 (2d Cir. 2006) ("As noted in *Chang* v. *United States* and *Pham* v. *United States*, the district court has discretion to determine if a testimonial hearing will be conducted." (citations omitted)); *Chang* v. *United States*, 250 F.3d 79, 85 (2d Cir. 2001) (observing that the movant's "claim was not summarily dismissed by the district court.   At the request of the court, the record was supplemented by a detailed affidavit from trial counsel credibly describing the circumstances concerning [the Section 2255 claim].   We believe that with that submission the record was sufficient to support dismissal of the petition.").   To warrant a hearing, the motion must set forth specific facts supported by competent evidence, raising detailed and controverted issues of fact that, if proved at a hearing, would entitle him to relief.   *See, e.g.*, *Machibroda*, 368 U.S. at 494.

In determining whether the assertions in a Section 2255 motion warrant discovery or a hearing, the court must take into account admissions made by the defendant at his plea hearing, for "[s]olemn declarations in open court carry a strong presumption of verity."   *Blackledge* v. *Allison*, 431 U.S. 63, 74 (1977).

"[S]ubsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible."   *Id.*

## B.   The Court Denies De Jesus's Section 2255 Motion

### 1.   The Motion Is Untimely

Section 2255 requires, as relevant here, that De Jesus file his motion within one year of "the date on which the judgment of conviction becomes final."   28 U.S.C. § 2255(f)(1).   (*See* Br. 13 (acknowledging that this is the relevant inquiry); Opp. 12 n.1 (same)).[8]   A *pro se* petition is deemed filed on the date that the inmate delivers it to the prison officials for transmittal to the court.   *Noble* v. *Kelly*, 246 F.3d 93, 97-98 (2d Cir. 2001); *see also* Rule 3(d) of the Rules Governing Section 2255 Proceedings ("A paper filed by an inmate confined in an institution is timely if deposited in the institution's internal mailing system on or before the last day for filing....   Timely filing may be shown by a declaration in compliance with 28 U.S.C. § 1746 or by a notarized statement, either of which must set forth the date of deposit and state that first-class postage has been prepaid.").

---

[8]   The parties have not argued, nor does the record indicate, that any of the other triggering dates set forth in 28 U.S.C. § 2255(f) is implicated.   Nor does either side argue for equitable tolling of the one-year limitations period.   *See generally Baldayaque* v. *United States*, 338 F.3d 145, 151 (2d Cir. 2003) (discussing circumstances in which equitable tolling might be appropriate).   Finally, neither side suggests that De Jesus's motions for a sentence reduction pursuant to 18 U.S.C. § 3582(c)(2) tolled the limitations period and the Court finds that they do not.   *See Reyes* v. *United States*, No. 07 Civ. 10943 (SAS), 2009 WL 274482, at *4 (S.D.N.Y. Feb. 3, 2009).

The judgment in this case was issued on May 30, 2014, giving De Jesus until June 13, 2014, to file an appeal.   Because De Jesus elected not to file an appeal, the one-year time period for filing the Motion began to run on June 14, 2014 (i.e., the date his conviction became final), and ended on June 14, 2015. De Jesus dated his motion for June 29, 2015; the mailing envelope is postmarked July 6, 2015; and the motion was docketed by the Court on July 14, 2015.   (Dkt. #298).   Given this timeline, the Court raised the issue of timeliness in its Order to Amend.   (Dkt. #302 ("Because Mr. de Jesus's § 2255 motion, dated June 29, 2015, was filed more than one year after June [14], 2014 — the date that his conviction became final for purposes of calculating the statute of limitations under § 2255(f) — it appears that the motion is time-barred.")).[9]

In his supporting memorandum of law, De Jesus states that "the motion was wrongly dated which is a [clerical] mistake but it was placed in the MVCC's mailbox for ahead of June 12, 2015."   (Br. 13).   This explanation is simply not credible: It makes no sense that De Jesus would misdate his submission in this manner, i.e., by selecting a date that was more than two weeks *after* the limitations period had ended.   It is almost certainly the case that De Jesus was unaware of the terminal date of the limitations period until he received the Order to Amend, and such ignorance is not a basis for tolling.   *See United*

---

[9]     The Court mistakenly used the date of June 12, 2014 in its Order.

*States* v. *Delgado*, No. 00 Civ. 2376 (JFK), 2003 WL 21219850, at *3 (S.D.N.Y. May 22, 2003).   Moreover, given the July 6 postmark — a date that De Jesus does not contest — it is far more likely that the motion was submitted to prison officials on or after June 29.   Finally, De Jesus's statements in his memorandum, though made under oath, do not suffice to demonstrate timeliness under Rule 3(d), which requires inmates to indicate "set forth the date of deposit."   For all of these reasons, De Jesus's Section 2255 motion is denied as untimely.

### 2.   De Jesus's Claims Are Barred, at Least in Part, by His Knowing and Voluntary Waiver

Separately, De Jesus may be barred from seeking relief under 28 U.S.C. § 2255 because he knowingly and voluntarily waived his right to "bring a collateral challenge, including but not limited to an application under Title 28, United States Code, Section 2255 and/or Section 2241 ... of any sentence within or below the Stipulated Guidelines Range of 108 to 135 months' imprisonment."   (Plea Agmt. 4).   De Jesus was allocuted on this specific waiver provision at the time of his guilty plea, and confirmed to the Court that he understood the provision to mean that if the Court were to sentence him to "135 months or anything less than 135 months, but more than 60 months, [he was] not going to appeal or otherwise challenge that component of [his] sentence."   (Plea Tr. 22).

"[A] voluntary and intelligent plea of guilty made by an accused person, who has been advised by competent counsel, may not be collaterally attacked."

26

*Bousley* v. *United States*, 523 U.S. 614, 621 (1998) (internal citations omitted).

More to the point, where a defendant "understood that he was waiving

altogether his right to appeal and to collaterally attack his conviction ... [he]

made a knowing and voluntary waiver."   *United States* v. *Cook*, 722 F.3d 477,

482-83 (2d Cir. 2013) (internal quotation marks omitted); *see also United

States* v. *Rosa*, 123 F.3d 94, 97 (2d Cir. 1997) ("[A] defendant's knowing and

voluntary waiver of his right to appeal a sentence within an agreed guideline

range is enforceable.").

A waiver is "knowing" if the "defendant fully understood the potential

consequences of his waiver."   *United States* v. *Monzon*, 359 F.3d 110, 116 (2d

Cir. 2004).   In making that determination,

> the district court [is] entitled to rely upon the
> defendant's sworn statements, made in open court ...,
> that he understood the consequences of his plea, had
> discussed the plea with his attorney, knew that he could
> not withdraw the plea, understood that he was waiving
> his right to appeal a sentence below [the agreed-upon
> time], and had been made no promises except those
> contained in the plea agreement. See *Blackledge* v.
> *Allison*, 431 U.S. 63, 74, 97 S.Ct. 1621, 52 L.Ed.2d 136
> (1977) ("The subsequent presentation of conclusory
> allegations unsupported by specifics is subject to
> summary dismissal, as are contentions that in the face
> of the record are wholly incredible."); *see also United
> States* v. *DeJesus*, 219 F.3d 117, 121 (2d Cir. 2000) (per
> curiam) (rejecting the defendant's assertion that he did
> not knowingly waive his right to appeal in his plea
> agreement because that contention was inconsistent
> with his statements during the plea colloquy), *cert.
> denied*, 531 U.S. 1001, 121 S.Ct. 502, 148 L.Ed.2d 472
> (2000); *United States* v. *Torres*, 129 F.3d 710, 715 (2d
> Cir. 1997) ("A defendant's bald statements that simply

27

> contradict what he said at his plea allocution are not
> sufficient grounds to withdraw the guilty plea.").

*United States* v. *Hernandez*, 242 F.3d 110, 112-13 (2d Cir. 2001).

An appeal waiver is presumptively enforceable; only in very limited circumstances, such as a violation of a defendant's Sixth Amendment right to counsel or the Government's breach of the plea agreement, will it be found unenforceable.   *United States* v. *Coston*, 737 F.3d 235, 237 (2d Cir. 2013) (per curiam).   Here, De Jesus claims that he received ineffective assistance from his counsel, David Touger, at both his guilty plea and sentencing proceedings. Analysis of the enforceability of De Jesus's waiver differs in each setting.

"An ineffective assistance of counsel claim survives the guilty plea or the appeal waiver only where the claim concerns the advice the defendant received from counsel" regarding a waiver of appeal rights.   *Parisi* v. *United States*, 529 F.3d 134, 138 (2d Cir. 2008) (citation omitted); *Monzon*, 359 F.3d at 118-19 ("The appeal waiver would be unenforceable if the record of the criminal proceeding revealed that the claim that the waiver was the result of ineffective assistance of counsel was meritorious.").   "Thus, although challenging the attorney's role in shaping the defendant's bargaining position cannot avoid the waiver, challenging the attorney's advice about that bargaining position, by connecting the knowing and voluntary nature of the defendant's plea decision with the attorney's conduct, does."   *Parisi*, 529 F.3d at 138-39; *see also Frederick* v. *Warden, Lewisburg Corr. Facility*, 308 F.3d 192, 195-96 (2d Cir. 2002) (observing that the presumption that a waiver is enforceable may be

28

overcome by "an attack on the validity of the process by which the waiver has been procured, here, the plea agreement" (citations omitted)).

By contrast, where there is a knowing and voluntary waiver of the right to appeal at the time a defendant enters a plea of guilty, that waiver precludes a challenge under Section 2255 to the sentence — even where that challenge concerns the quality of an attorney's representation of the defendant at sentencing. *See Garcia-Santos* v. *United States*, 273 F.3d 506, 509 (2d Cir. 2001) (upholding waiver of the right to collaterally attack a sentence where petitioner's attack was based, in part, on alleged ineffective assistance of counsel related to the petitioner's sentencing); *see also United States* v. *Cabrera*, 563 F. App'x 861, 862 (2d Cir. 2014) (summary order) ("Many of Cabrera's arguments miss the point, and cannot avoid the plea waiver, because they focus on pre-plea and post-plea events rather than the plea agreement process."); *United States* v. *Djelevic*, 161 F.3d 104, 107 (2d Cir. 1998) ("emphatically reject[ing]" the contention that a defendant sentenced within the range stipulated by a waiver of appellate rights can nonetheless appeal based on ineffective assistance of counsel at sentencing).

What all of this means is that De Jesus's challenges to his sentencing proceeding are barred by his waiver.   As set forth in the remainder of this Opinion, the challenges to both plea and sentencing also fail on the merits.

29

### 3.    De Jesus Received the Effective Assistance of Counsel at His Plea

De Jesus claims, with respect to his guilty plea, that (i) he was "tricked" or "deceived" into signing the Plea Agreement (and, by extension, pleading guilty pursuant to that Agreement) by his counsel (Br. 7, 10, 11; Reply 8); (ii) he did not read the Plea Agreement, and can neither speak nor read English (Br. 2, 5; Reply 5, 7-8); (iii) he did not understand the charges against him (Reply 9); (iv) he did not understand that he was stipulating to a drug quantity of between one and three kilograms of heroin (Br. 2, 4, 8, 11; Reply 2-4, 5, 6, 7-8); (v) he did not understand that he was stipulating to a role enhancement (Br. 12); (vi) his attorney promised him early deportation as a component of his guilty plea (Br. 3, 7, 9; Reply 10); and (vii) his attorney was effectively operating as a member of the prosecution team, thereby precipitating a conflict of interest (Br. 6).   For the reasons set forth in the remainder of this section, all of these claims fail.

As a preliminary matter, De Jesus's claims implicate several related legal doctrines.   First among these is the principle that a defendant is entitled to the effective assistance of counsel in connection with plea negotiations.   *See Lafler*, 132 S. Ct. at 1384; *Purdy* v. *United States*, 208 F.3d 41, 44-45 (2d Cir. 2000).   In this regard, counsel must communicate to the defendant the terms of the plea offer, and should usually inform the defendant of the strengths and weaknesses of the case against him, as well as the alternative sentences to which he will most likely be exposed.   *Purdy*, 208 F.3d at 45; *see generally*

*Missouri* v. *Frye*, — U.S. —, 132 S. Ct. 1399, 1408 (2012) (stating that defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused); *Davis* v. *Greiner*, 428 F.3d 81, 88 (2d Cir. 2005) ("[C]ounsel has a professional obligation to adequately inform [his] client about the considerations that are relevant to [his] client's decision to accept or deny a plea bargain."); *Pham*, 317 F.3d at 182 (noting that defense attorneys have "a constitutional duty to give their clients professional advice on the crucial decision of whether to accept a plea offer from the government").   An attorney's failure to communicate a plea offer to his client, or to provide objectively reasonable advice about the decision to plead guilty, may amount to constitutionally deficient performance.   *See, e.g., Cullen* v. *United States*, 194 F.3d 401, 404 (2d Cir. 1999); *United States* v. *Gordon*, 156 F.3d 376, 380 (2d Cir. 1998); *Boria* v. *Keane*, 99 F.3d 492, 496-97 (2d Cir. 1996).

A second, related principle is that a defendant's plea of guilty must be knowing and voluntary.   As relevant here, a plea cannot be considered voluntary unless the defendant has "an awareness of the true nature of the charge against him."   *Oyague* v. *Artuz*, 393 F.3d 99, 106 (2d Cir. 2004) (citing *Henderson* v. *Morgan*, 426 U.S. 637, 645 (1976)); *cf.* Fed. R. Crim. P. 11(b)(1)(G) ("Before the court accepts a plea of guilty or nolo contendere, the defendant may be placed under oath, and the court must address the defendant personally in open court.   During this address, the court must inform the

31

defendant of, and determine that the defendant understands ... the nature of each charge to which the defendant is pleading.").

Put simply, De Jesus's current claims of his own ignorance — and, worse yet, of active misconduct by his prior counsel — are wholly refuted by the record.   For starters, the Government's plea offer was communicated in a letter agreement addressed to David Touger and dated December 26, 2013. Touger discussed the terms of the plea offer with De Jesus and, when the latter demurred, moved the Court in January 2014 for the appointment of a second CJA attorney to advise De Jesus concerning the very same plea offer.   (*See* Jan. 14 Tr.).   By the time of the plea proceeding on January 30, 2014, both Touger and Donald DuBoulay had discussed the plea offer with De Jesus, and De Jesus confirmed for the Court that he wished to enter a guilty plea in accordance with the Government's plea offer to the lesser-included offense of Count One of the Indictment.

Significantly, the Court underscored for De Jesus the importance of understanding all that was occurring during the plea proceeding, and exhorted De Jesus to speak up if at any point he did not hear or understand what the interpreter was saying.   (Plea Tr. 2).[10]   It then placed De Jesus under oath and asked him an extensive series of questions that were designed to ensure — and did ensure to the Court's satisfaction — that any plea by De Jesus was

---

[10]   And, indeed, on the one occasion when De Jesus was unclear about the Court's questioning, he sought clarification and an opportunity to discuss the matter with counsel.   (*See* Plea Tr. 10).

knowing and voluntary.   The Court confirmed that De Jesus had reviewed the Indictment (which had been translated for him into Spanish) with his counsel, and that he had discussed with counsel "the charge to which [he] intend[ed] to plead guilty and any possible defenses that [he] might have to that charge." (*Id.* at 7).   Later in the allocution, the Court discussed the charge further with De Jesus, and reviewed with him (with the assistance of the Government) the elements of that offense.   (*See id.* at 12-14).   This colloquy was sufficient to ensure the notice required by Rule 11, and, more importantly, to ensure De Jesus's knowledge of the charge against him.   *See United States* v. *Maher*, 108 F.3d 1513, 1523 (2d Cir. 1997) (upholding guilty pleas under Rule 11 where "each defendant acknowledged that he had read the indictment, had discussed the charges with his attorney, and knew that he was pleading guilty to counts charging money laundering and conspiracy to launder money"); *United States* v. *Parkins*, 25 F.3d 114, 118 (2d Cir. 1994) (holding that defendant received requisite notice under Rule 11 where, among other things, he acknowledged at plea hearing that he had "read [the Information], understood it, and discussed it with his attorney").

The Court also confirmed, in detail, that De Jesus had reviewed and was aware of the terms of his Plea Agreement with the Government:

> THE COURT: Is that your signature on the last page of the plea agreement, sir?
>
> THE DEFENDANT: Yes.
>
> THE COURT: Did you sign it today in the presence of your attorney?

33

> THE DEFENDANT: Yes.
>
> THE COURT: Before you signed this agreement, was it translated for you?
>
> THE DEFENDANT: Yes.
>
> THE COURT: Did you have an opportunity to discuss this agreement with your attorney before you signed it?
>
> THE DEFENDANT: Yes.
>
> THE COURT: Did you fully understand the agreement before you signed it?
>
> THE DEFENDANT: Yes.

(Plea Tr. 20-21).   The Court then reviewed several provisions of the Agreement, including (i) the parties' stipulations as to the Guidelines and the resulting range, and (ii) the waivers that proceeded from the Guidelines stipulations. (*See id.* at 21-23).

Finally, the Court confirmed that the Plea Agreement reflected the totality of the agreement between the defense and the Government:

> THE COURT: Does this written plea agreement that I've marked as Court Exhibit 1 constitute your complete and total understanding of the entire agreement between you and the government?
>
> THE DEFENDANT: Yes.
>
> THE COURT: Has anything been left out of this agreement?
>
> THE DEFENDANT: No.
>
> THE COURT: Other than what is contained in this agreement, has anyone made any promise to you or offered you any inducement in order to get you to either sign the agreement or to enter a guilty plea in this case?

34

> THE DEFENDANT: No.
>
> THE COURT: Has anyone threatened you or forced you either to sign this plea agreement or to plead guilty in this case?
>
> THE DEFENDANT: No.
>
> THE COURT: Has anyone made any promise to you concerning your sentence?
>
> THE DEFENDANT: No.

(Plea Tr. 23-24).   In the face of these very specific statements, made under oath, the Court cannot credit De Jesus's current claims that he did not understand the charges against him or the specifics of his agreement with the Government, nor his claims that he was tricked into stipulating to a particular quantity of heroin or a role enhancement.

Additional evidence in the record belies De Jesus's current claims. During the plea proceeding, the Government mentioned specifically that De Jesus had stipulated to a role enhancement; De Jesus neither objected nor expressed surprise.   (Plea Tr. 16).   Later, in the Presentence Investigation Report, the Probation Office espoused both a one-to-three-kilogram quantity of heroin for the base offense level and a four-level enhancement for role; De Jesus was aware of the contents of the Report, but expressed no objections in his written statement to the Court.   During the sentencing proceeding itself, De Jesus was specifically questioned about his review of the Presentence Investigation Report, and only voiced an objection to a four-level enhancement, which was more than the two levels to which he had previously stipulated.

35

(*See* Sent. Tr. 6).   Thereafter, the Court discussed the relevant Guidelines enhancements extensively with counsel for the parties, during which time the quantity and role enhancements were repeatedly mentioned and substantiated — again without expressions of surprise or disapproval from De Jesus.   (*See id.* at 9-18, 19-36).   The Court then adopted the parties' stipulations as to drug quantity and role.   (*See id.* at 39-41).[11]   Even when the Court imposed an 87-month term of imprisonment, which was obviously more than the 60-month terms received by the Gonzalez brothers, De Jesus did not object.   (*Id.* at 41-42).

The contemporaneous records are sufficient to refute De Jesus's claims of ignorance or involuntariness, but here the Court has more: Former counsel David Touger has submitted an affidavit in which he avers, in relevant part, that upon receiving a favorable plea offer from the Government that embodied a reduced mandatory minimum term of imprisonment, he visited De Jesus in prison with a Spanish interpreter and "reviewed each and every paragraph of the plea offer with Mr. De Jesus so that he would understand exactly what the offer consisted of."   (Touger Aff. ¶ 4).   Touger also recounted conversations

---

[11]   De Jesus faults counsel and the Court for insufficiently detailing the evidentiary basis for the base offense level and role enhancement.   (Br. 12).   Of course, the supporting facts were not discussed at significant length during the sentencing proceeding because (i) the Guidelines provisions and their supporting facts had been stipulated to by the parties and (ii) many of the supporting facts were also contained in paragraphs of the Presentence Investigation Report that the Court had adopted without objection from the parties.   It is clear, however, that the discussions at sentencing, as well as the information that is detailed in the remainder of this Opinion, demonstrate both the drug quantity and the role enhancement.

with his client in which he allayed De Jesus's concerns about the imposition of a two-level role enhancement, and he observed no reluctance on De Jesus's part to stipulating to a one-to-three-kilogram quantity of heroin for base offense level purposes.   (*Id.* at ¶¶ 5-6, 8, 10).   The Court accepts Touger's recounting of events, which accords with its own recollection of the case and with the contemporaneous evidence.[12]

Relatedly, De Jesus claims ineffectiveness in counsel's promise to him that De Jesus would be deported within two years of the completion date of his sentence.   (*See* Br. 3, 7, 9; Reply 10).   To the extent that this claim is viewed as one of ineffectiveness in connection with the plea, it fails.   The Court confirmed with De Jesus personally that the Plea Agreement contained all of the agreements between the parties, and that no one had made him promises concerning his sentence.   (Plea Tr. 23-24).   Moreover, the email cited by De Jesus as evidence of counsel's "guarantee" of early deportation (*see* Br. 3 & Ex. A), contains no such thing; Touger merely recounts certain experiences of prior clients, and in no way commits to obtain a similar result for De Jesus.

---

[12]     De Jesus's intimation that Touger was in fact an agent of the Government, or was operating under some other "conflict of interest" (Br. 6), can be rejected in short order. The Court observed firsthand the tenacity with which counsel advocated for the best possible plea deal from the Government, which was no easy feat given the surfeit of evidence against De Jesus, as well as the lowest sentence possible.   For similar reasons, the Court rejects any suggestion that Touger could have obtained a better plea offer from the Government.   (*See* Br. 7).   De Jesus has not articulated what form such an offer would have taken and, perhaps more importantly, everything in the record indicates that the Government would *not* have made an offer to De Jesus that replicated those made to the Gonzalez brothers, the female conspirators, or the mill workers. (*See, e.g.*, Sent. Tr. 26-28 (Government distinguishing De Jesus from other conspirators)).

37

In his affidavit, Touger avers that he could not, and did not, guarantee that De Jesus would be deported early (Touger Aff. ¶ 7); his account is logical and consistent with the other evidence of record, and the Court accepts it.

Even if De Jesus had satisfied the deficient performance prong of the *Strickland* standard — and he has not — his claims of ineffectiveness in connection with the plea proceeding would fail on the prejudice prong. "[T]o obtain relief on this type of claim, a petitioner must convince the court that a decision to reject the plea bargain would have been rational under the circumstances." *Padilla* v. *Kentucky*, 559 U.S. 356, 372 (2010) (citing *Roe* v. *Flores-Ortega*, 528 U.S. 470 (2000)). "A self-serving post-conviction statement does not, standing alone, establish prejudice." *Hernandez* v. *Larkin*, No. 12 Civ. 8090 (AJN) (SN), 2013 WL 4453316, at *12 (S.D.N.Y. Aug. 19, 2013) (citations omitted); *accord United States* v. *Torres*, 129 F.3d 710, 715-17 (2d Cir. 1997). "This is especially true when [the petitioner] stated in open court that he understood" the consequences of his guilty plea. *Hernandez*, 2013 WL 4453316, at *12 (citing *Blackledge*, 431 U.S. at 74, and *Padilla* v. *Keane*, 331 F. Supp. 2d 209, 217 (S.D.N.Y. 2004)); *accord United States* v. *Arteca*, 411 F.3d 315, 322 (2d Cir. 2005). A petitioner must corroborate his statements with "some objective evidence other than [his own] assertions to establish prejudice." *Pham*, 317 F.3d at 182.

38

While De Jesus states that he would not have accepted the plea offer had he fully understood the quantity of heroin to which he was stipulating (Br. 4),[13] such statements cannot suffice on this record.   As noted — and as the Court came to understand in the course of taking guilty pleas from and then sentencing 15 other co-defendants — the Government had extensive documentary and testimonial evidence, including conversations intercepted over De Jesus's cell phone, of a brief but productive conspiracy involving more than one kilogram of heroin.   Had the matter proceeded to trial, De Jesus would almost certainly have been convicted of a charge that contained a 10-year mandatory minimum; by pleading guilty to the plea offer obtained by his counsel, he wisely subjected himself to only a 5-year mandatory minimum.   In sum, there was no ineffectiveness by counsel in connection with De Jesus's plea negotiations or plea entry.

### 4.    De Jesus Received the Effective Assistance of Counsel at Sentencing

Several of the claims discussed in the preceding section are repurposed by De Jesus as claims of ineffectiveness at sentencing; among other things, De Jesus argues that counsel (i) failed to investigate the matter fully; (ii) failed in allowing a base offense level based on a one-to-three-kilogram quantity of heroin and a two-level role enhancement; and (iii) "did nothing more than simply attend" De Jesus's sentencing hearing.   (Br. 7, 9, 10-12; Reply 2, 4, 6).

---

[13]    De Jesus makes no similar claim regarding the role enhancement.

As noted above, these claims are plainly barred by the waiver knowingly and voluntarily executed by De Jesus at the time of his guilty plea.   However, these claims also fail on the merits.

De Jesus's failure-to-investigate claim is intimately bound up in his claim that there was no basis for either the base offense level or the role enhancement.   But as detailed above, abundant evidence supported both Guidelines assessments.   The seizure at the mill on May 13, 2013, resulted in the recovery of approximately one-half of a kilogram of heroin.[14]   However, information from the sentencings of De Jesus and the "mill workers" made clear that similar events had happened several times previously, while the sentencing of Xiomar Mantilla made clear that Mantilla had purchased 100-150 grams of heroin from De Jesus on multiple occasions in 2013. Presumably for this reason, no one objected at sentencing to the Government's repeated references to the one-to-three-kilogram quantity.   As for role, De Jesus cannot dispute, and did not dispute at sentencing, that he supervised Becky Reyes, Yisel Heredia, or Yolanda Lopez, warranting, at the very least, a two-level enhancement.[15]

---

[14]   The Presentence Investigation Report, to which the parties did not object, specified that the amount of heroin recovered from the May 13 raid "exceeded 1 kilogram."   (PSR ¶ 19).   However, the Court will use the lower quantity specified by the Government in its submissions.

[15]   For this reason, the Court has given less weight to the sworn statements submitted on De Jesus's behalf by other of his co-defendants.

40

The Court also rejects De Jesus's assertion that counsel did no more than appear at sentencing.   Counsel prudently argued for the Court to consider anticipated Guidelines amendments, which, contrary to De Jesus's arguments (*see* Br. 9), the Court did.   He also asked the Court to vary downward based on the likelihood that De Jesus would be deported following the completion of his sentence.   (Def. Sent. Ltr. 8).   At sentencing, counsel forcefully argued that De Jesus should be considered on a par with the Gonzalez brothers (Sent. Tr. 29-35); that counsel did not succeed fully in making his argument is attributable to the sheer quantity of evidence of De Jesus's role in the conspiracy, and not to any deficiencies on the part of counsel.

For similar reasons, De Jesus cannot demonstrate prejudice, which would require him to show a reasonable probability that, but for counsel's substandard performance, he would have received a less severe sentence.   *See generally Lafler*, 132 S. Ct. at 1387.   This Court reviewed the record and listened carefully to both counsel at sentencing; it then imposed a sentence that balanced most fairly the factors set forth in 18 U.S.C. § 3553(a).   The Court would not have found a lower quantity for base offense level purposes; it would not have declined to impose a role enhancement (indeed, it seriously considered a three-level enhancement); it considered both Amendment 782 and the possibility of deportation in formulating its sentence; and it would not have imposed a sentence different than the 87-month term it imposed.

41

## CONCLUSION

De Jesus's motion under 28 U.S.C. § 2255 is DENIED.   A certificate of appealability shall be not granted, because De Jesus has not made a substantial showing of a denial of a federal right and appellate review is, therefore, not warranted.   *Hoffler* v. *Bezio*, 726 F.3d 144, 154 (2d Cir. 2013); *Tankleff* v. *Senkowski*, 135 F.3d 235, 241 (2d Cir. 1998); *Rodriquez* v. *Scully*, 905 F.2d 24, 24 (2d Cir. 1990).   The Court additionally certifies under 28 U.S.C. § 1915(a)(3) that any appeal from this Order would not be taken in good faith, and therefore *in forma pauperis* status is denied for the purpose of an appeal.   *See Coppedge* v. *United States*, 369 U.S. 438, 444-45 (1962).   The Clerk of Court shall close the case.

The Government is directed to file a redacted version of its opposition memorandum, along with the exhibits other than the Touger Affidavit, on or before May 24, 2016.

SO ORDERED.

Dated:      May 10, 2016
            New York, New York

_____
      KATHERINE POLK FAILLA
      United States District Judge


**By First Class Mail To:**

Roberto Carlos De Jesus
Reg. No. 28963-050
CI Moshannon Valley
555 Geo Drive
Philipsburg, PA 16866